**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PARKER BEDNASEK,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-9300-JAR-JPO** |
| **KRIS KOBACH, KANSAS SECRETARY OF STATE,** | |
| **Defendant.** | |

**MEMORANDUM AND ORDER**

Plaintiff Parker Bednasek challenges the Kansas Documentary Proof of Citizenship law and a related regulation under 42 U.S.C. § 1983, claiming that they violate the Equal Protection and Privileges or Immunities Clauses of the Fourteenth Amendment to the United States Constitution. Before the Court are cross motions for summary judgment (Docs. 141, 142). Defendant moves for summary judgment on both of Plaintiff's remaining claims. Plaintiff moves on the right to travel claim. The Court heard oral argument on these motions on March 3, 2017.[1] Having fully considered the arguments and evidence presented by the parties on the briefs and at the hearing, the Court grants in part and denies in part Defendant's motion for summary judgment. Defendant's motion for summary judgment is denied on the right to vote claim and granted on the right to travel claim. Plaintiff's motion for summary judgment is denied.

---

[1]The Court allowed a consolidated oral argument on these motions with the plaintiffs' pending motion for summary judgment on a Privileges or Immunities claim in the related case of *Fish v. Kobach*, No. 16-2105. That motion remains pending. Although the Court consolidated the oral argument, it has been careful to evaluate these cases separately. The Court has not cross-referenced or relied upon the record or brief in the *Fish* matter in deciding the instant motions in this case.

## I. The Kansas Documentary Proof of Citizenship Law

Under Kansas law, legally qualified voters must register in order to be eligible to vote,[2] and only United States citizens over the age of eighteen are eligible to register to vote.[3]  Before 2013, Kansas voter registration applicants met the citizenship requirement by signing an attestation of United States citizenship on the registration application.  The Secure and Fair Elections Act ("SAFE Act") became law in April 2011.  It requires voter registration applicants to submit documentary proof of citizenship ("DPOC") at the time they apply to register to vote:

(l) The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship. Evidence of United States citizenship as required in this section will be satisfied by presenting one of the documents listed in paragraphs (1) through (13) of subsection (l) in person at the time of filing the application for registration or by including a photocopy of one of the following documents with a mailed registration application. After a person has submitted satisfactory evidence of citizenship, the county election officer shall indicate this information in the person's permanent voter file. Evidence of United States citizenship shall be satisfied by providing one of the following, or a legible photocopy of one of the following documents:

(1) The applicant's driver's license or nondriver's identification card issued by the division of vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship;
(2) the applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or secretary of state;
(3) pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport;
(4) the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States bureau of citizenship and immigration services by the county election officer or the secretary of state, pursuant to 8 U.S.C. § 1373(c);

---

[2]K.S.A. § 25-2302.

[3]Kansas Constitution art. 5, § 1.

(5) other documents or methods of proof of United States citizenship issued by the federal government pursuant to the immigration and nationality act of 1952, and amendments thereto;

(6) the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number;

(7) the applicant's consular report of birth abroad of a citizen of the United States of America;

(8) the applicant's certificate of citizenship issued by the United States citizenship and immigration services;

(9) the applicant's certification of report of birth issued by the United States department of state;

(10) the applicant's American Indian card, with KIC classification, issued by the United States department of homeland security;

(11) the applicant's final adoption decree showing the applicant's name and United States birthplace;

(12) the applicant's official United States military record of service showing the applicant's place of birth in the United States; or

(13) an extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.[4]

In addition to this DPOC requirement, each registration application in Kansas requires an attestation by the applicant as to the applicant's residence, age of majority, and United States citizenship, signed under penalty of perjury.

The DPOC requirement was made effective on January 1, 2013.[5] A person already registered to vote on the Act's effective date is not required to submit evidence of citizenship.[6] Defendant later promulgated K.A.R. § 7-23-14(c), which provides that "[a] registered voter who has previously provided sufficient evidence of United States citizenship with a voter registration application in this state shall not be required to resubmit evidence of United States citizenship with any subsequent voter registration application."

If an applicant is a United States citizen but unable to provide one of the thirteen forms of identification listed in subsection (l), the statute allows that applicant to submit another form of

---

[4]K.S.A. § 25-2309(l).

[5]*Id.* § 25-2309(u) (subsection deleted 2016).

[6]*Id.* § 25-2309(n).

citizenship documentation by directly contacting the Secretary of State's Office. In these cases, the state election board shall give the applicant an opportunity for a hearing before assessing the evidence of citizenship to determine whether it is satisfactory.[7] The state election board is composed of the Secretary of State, the Attorney General, and the Lieutenant Governor.[8]

If an incomplete voter registration applicant fails to submit the requisite DPOC before the registration deadline in Kansas, that applicant can still submit DPOC to the county election office in person, by mail, or electronically (including by text message) before midnight on the day before an election.[9]

On June 25, 2015, Defendant Kobach promulgated K.A.R. § 7-23-15, which became effective on October 2, 2015. The regulation applies to registration applications that have been deemed "incomplete." Such applications are "cancelled" if they do not produce DPOC, or otherwise cure the deficiency in the application, within 90 days of application. The applicant must submit a new, compliant voter registration application in order to register to vote.

On July 1, 2015, the legislature granted the Secretary of State authority to prosecute election crimes, including attempts by noncitizens to register to vote, or cast a ballot.[10]

## II.     Uncontroverted Facts

The following material facts are either uncontroverted or stipulated to for purposes of summary judgment. The Court construes the facts in the light most favorable to the nonmoving party.

---

[7]*Id.* § 25-2309(m).

[8]K.S.A. § 25-2203(a).

[9]K.A.R. § 7-23-14(b).

[10]K.S.A. § 25-2435(a).

*Implementation and Enforcement of DPOC Law*

Since the DPOC law went into effect in Kansas, 382,895 individuals have successfully registered to vote. For the presidential election in 2016, over 1.8 million Kansans were registered to vote, which is a record high number. Kansans may apply to register to vote in person, by mail, through a voter registration agency, in conjunction with applying for a Kansas driver's license, or "by delivery to a county election officer to be registered."[11] The Kansas Election Voter Information System ("ELVIS") is a database that contains every registered voter, every voter registration applicant, and everyone who used to be a registered voter but was subsequently cancelled. If an applicant has not provided DPOC, or if the application is otherwise missing required information, the record is designated as "in suspense" or "incomplete" until the application is completed.[12] Neither the registration application nor ELVIS contain fields for an applicant's place of birth.

The Secretary of State's office recommends to each of the 105 county election officials that they provide at least three notices of the deficiency to an incomplete applicant by mail within the 90-day window of time before the application is cancelled. Individuals who are cancelled after the 90-day window passes without compliance are not notified of the cancellation. All of the notices provided by the counties are sent pre-cancellation.

Defendant and county election officers may accept DPOC at a different time or in a different manner than an application for voter registration, as provided in (l), "so long as the applicant's eligibility can be adequately assessed by the secretary of state or county election

---

[11]K.S.A. §§ 25-2309(a), -2352(a)(1).

[12]There are two preliminary injunctions in place that require presently require Defendant to register to vote those individuals who either register at the time they apply for a driver's license, or use a "Federal Form" to register. *See Fish v. Kobach*, 189 F. Supp. 3d 1107 (2016), *aff'd*, 840 F.3d 710 (10th Cir. 2016); *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), *rev'g* 195 F. Supp. 80 (2016).

officer as required by this section."[13]  Under this authority, Defendant has established

interagency agreements for verifying whether one of the thirteen forms of DPOC listed in § 25-

2309(l) may be on file with two Kansas agencies.  First, on January 7, 2014, Defendant and

Robert Moser, MD, Secretary of the Kansas Department of Health and Environment ("KDHE"),

entered into an Interagency Agreement, whereby the KDHE agreed to crosscheck the names of

incomplete voter registration applicants with its database of birth certificates and marriage

licenses, and provide Defendant with the results.  Defendant sends a list of new voter registration

applicants on the suspense list to the KDHE on approximately a monthly basis.  The agreement

makes clear that "The Kansas OVS maintains records only on Kansas vital events occurring in

the State of Kansas.  The voter registration form does not collect State of birth for the voter."[14]

The KDHE maintains birth records only of those individuals born in the State of Kansas.

Kansas Elections Director Bryan Caskey testified that "generally speaking . . . between 40 and

50 percent of the records that we present to KDHE will come back with an affirmative response

of yes, there is proof of citizenship on file.  That information is provided to the counties."[15]

Indeed, according to Defendant, as of January 22, 2014, just a few weeks after implementing the

KDHE verification policy, 7716 registrations were completed out of a total of 20,201 that had

been deemed incomplete at the time due to lack of DPOC.  Former Plaintiff Cody Keener was

registered to vote after his birth certificate was verified through the KDHE process.

Defendant does not check for birth certificate information with any state other than

Kansas.  Caskey has contacted several neighboring states in an attempt to obtain birth certificate

---

[13]K.S.A. § 25-2309(t).

[14]Doc. 163-10 at 7 (Pl. Ex. J.).

[15]Doc. 163-8 at 63:20–25 (Pl. Ex. H).

information, but either their state laws prohibit such information sharing, or it would be cost-prohibitive—"in the thousands of dollars per record."[16]

Second, in May 2016, Defendant began coordinating with the Kansas Department of Revenue ("KDOR") to verify citizenship documents that may have been provided by voter registration applicants when they applied for a Kansas driver's license. The Division of Vehicles, a subdivision of the KDOR, scans DPOC in the course of verifying applicants' Kansas residency. Defendant and the county clerks can now verify with the KDOR whether incomplete voter registration applicants may have provided acceptable DPOC to the KDOR when applying for a driver's license. They have access to a web portal whereby they can access the KDOR database and determine whether DPOC exists for an incomplete voter. They also send lists periodically to the KDOR for verification, similar to the KDHE practice. Caskey contends that in addition to those confirmed through the KDHE process, "others" are confirmed through the KDOR, and "most" provide their own DPOC within the 90-day period provided under K.A.R. § 7-23-15. Former Plaintiff Alder Cromwell was registered to vote after his DPOC was discovered in the KDOR database.

Between January 1, 2013 and December 5, 2016, 20,406 voter registration applications were cancelled or deemed incomplete for failure to produce DPOC.[17]

***Hearing Procedure under § 25-2309(m)***

K.S.A. § 25-2309(m) provides a way for applicants to comply with the DPOC law if they do not possess one of the thirteen forms of citizenship acceptable under subsection (l). Under this provision, an applicant must contact the state election board and schedule a hearing to prove citizenship through other means. Although information about this process is available on the

---

[16]Doc. 156-4, at 142:3 (Def. Ex. C).

[17]Doc. 144-5 ¶ 7 (Def. Ex. D); Doc. 156-5 ¶ 4 (Def. Ex. D).

Secretary of State's website, including a copy of the form to submit a request for an informal hearing, Defendant does not notify individuals on the suspense list about this option. It is the applicant's responsibility to learn this information by visiting the website. Defendant has not produced, nor is Caskey aware of, a list of sufficient alternative forms of DPOC that would satisfy the law. As of June 15, 2016, there had been three total hearings under this provision.[18]

The League of Women Voters also provides information to voters about the hearing process under subsection (m) by including a link on its website and in its "teaching module" for voters to access Defendant's form for requesting a hearing under subsection (m).

***Evidence of Noncitizen Voter Fraud***

When the Kansas legislature considered the DPOC bill, it heard testimony and collected evidence of noncitizens illegally registering to vote and voting. Stacia D. Long, the Seward County Clerk, and Crystal Clemens, the Seward County Deputy Clerk, testified about an instance in that county in 1997, where employees of hog farms "were transported to our office by their employer to register to vote. . . . The issue was so heated that many questioned how we knew each registrant was a citizen."[19] Long and Clemens stated that rather than racially profile and only ask for proof of citizenship when they suspect registrants are noncitizens, they believe that all voters should be required to produce DPOC.

---

[18]Defendant controverts Plaintiff's statement of fact that no hearings have taken place since this date. First of all, that is not Plaintiff's statement of fact, which was temporally limited. Second, the evidence cited by Defendant is from Caskey's April 6, 2016 deposition, taken two months earlier than the statement cited by Plaintiff. Caskey stated in April that all three hearings took place in 2014, and that there were three more scheduled in 2016. Doc. 155-4, at 104:11–20 (Def. Ex. C). Defendant submits no evidence since that time demonstrating that these hearings actually took place. The Court therefore deems this fact uncontroverted.

[19]Doc. 144-22 (Def. Ex. T). Caskey submitted more detailed information about this Seward County instance, such as that "fifty aliens were registered to vote," but that information is not included in the 2011 statement by Long and Clemens. Because there is no indication of how Caskey has personal knowledge of these additional facts, the Court does not accept them as uncontroverted under Fed. R. Civ. P. 56(c)(4).

Additionally, Defendant provided the legislature with a chart of "Known Reported Incidents of Election Crimes, 1997–2010," dated February 9, 2011. This chart itemizes 220 incidents of voter fraud reports during that timeframe. This chart is not specific to noncitizen voter fraud, and it includes only reported instances of fraud. It indicates one case in 2008 in Finney County where a noncitizen registered and voted. It was referred to the county attorney, but the chart does not indicate whether any further action was taken. The chart indicates three instances of noncitizens registering to vote in 2008 in Wyandotte County, and one of those registrants casting a ballot. These instances were referred to the district attorney, and there is no indication of any further action taken.

The "Known Reported Incidents of Election Crimes," chart was apparently updated on January 14, 2014 for the years 1997–2012.[20] It shows a different result for the 2008 Finney County instance, stating that the case was referred to the county attorney, prosecuted, and that the defendant was granted a diversion. According to the updated chart, this was the only instance between 1997 and 2012 where noncitizen voter fraud was prosecuted in Kansas.

Defendant also submits evidence of noncitizen voter fraud compiled since the DPOC was debated and made law. Sedgwick County is the second largest county in Kansas. Tabitha Lehman, the County Election Commissioner for Sedgwick County, Kansas, has compiled a summary chart of noncitizens who unlawfully registered to vote prior to January 1, 2013. Lehman's office conducts voter registration drives at naturalization ceremonies, where her staff has discovered some newly-naturalized citizens who were already in the ELVIS database as having registered before becoming citizens. According to Lehman's records, eleven noncitizens registered to vote in Sedgwick County between April 16, 2003 and June 5, 2010. Of those

---

[20]Doc. 163-20 (Pl. Ex. T).

registrants, three voted. Two of these three registrants became citizens after registering to vote, and their illegal registration and voting came to light when one of Lehman's staff attempted to register them through the naturalization process. The third voter discovered that she had illegally voted when she was applying to be naturalized. She voted four times between 2004 and 2008, believing that as a permanent resident she was entitled to vote until a friend informed her otherwise. She asked to cancel her registration upon learning of her mistake.

Lehman's office also maintains records of noncitizens who unsuccessfully applied to register to vote since the DPOC went in to effect on January 1, 2013. According to Lehman's records, fourteen noncitizens have attempted to register to vote in Sedgwick County since January 1, 2013. Seven of these individuals were discovered by Lehman's staff when they applied to register at a naturalization ceremony. The remaining seven individuals were discovered upon requests for DPOC after failing to submit it at the time of registration.

Defendant submits four additional pieces of evidence that noncitizens in Kansas have registered to vote. First, Defendant submits Brad Bryant's declaration. Bryant is the Deputy Assistant Secretary of State for the Kansas Secretary of State's Office. He attests to his office's efforts in 2009 and 2010 to compare registered voters in ELVIS to the list of individuals with Kansas temporary driver's licenses. Because only noncitizens are issued temporary driver's licenses in Kansas, the Secretary of State's Office was able to determine whether noncitizens with temporary driver's licenses were registered to vote. The Secretary of State's Office discovered thirteen noncitizens with temporary driver's licenses that were registered to vote in Finney, Johnson, Lyon, and Sedgwick counties, three of whom actually voted. The Secretary of State's office was also notified in 2010 by the Sedgwick County election commissioner that he had been contacted by an official with the United States Department of Homeland Security,

"alerting him to the possibility that a non-United States citizen had registered and voted. The person was found to be registered and vote[d] in the ELVIS database, and records indicated the person had voted in five elections between 2000 and 2008."[21]

Second, Defendant submits an affidavit from Lehman recounting an attempt by a noncitizen to register to vote in Sedgwick County. It is clear from the dates and details set forth in this affidavit that Lehman is recounting an instance already captured by her chart—this noncitizen applied at the DMV on February 13, 2013, and Lehman's office contacted him by phone on June 27, 2013, at which time he admitted that he was not a citizen.[22]

Third, Defendant submits the Declaration of Elsa Ulrich, the County Clerk for Finney County, Kansas. She states that her office received a voter registration application from a non-citizen dated October 10, 2013. The applicant checked the box on the form indicating United States citizenship, and signed the attestation of citizenship. The applicant provided a permanent resident card number in the location on the application designated for a naturalization number; he also provided a copy of his permanent resident card with his application.

Thus, giving full weight to Defendant's evidence of voter fraud in Kansas suggests a total of twenty-nine individuals who successfully registered to vote before January 1, 2013 despite being noncitizens, nine of whom actually voted. Fifteen noncitizens have unsuccessfully attempted to register to vote since the DPOC law became effective on January 1, 2013.

Between July 1, 2015 and June 21, 2016, Defendant did not bring charges against any noncitizen for illegal registration and/or voting

.

---

[21]Oddly, this instance does not appear on Lehman's chart covering the same timeframe. *See* Doc. 144-8 at 3 (Def. Ex. F-1).

[22]Doc. 144-8 at 3, Reg. ID 5613774 (Def. Ex. F-1).

*Plaintiff's Attempt to Register in Douglas County, Kansas*

Plaintiff Parker Blake Bednasek is a United States citizen over the age of eighteen, who moved to Kansas in August 2014 to attend school at the University of Kansas ("KU"). Plaintiff was born in Oklahoma. His parents, who live in Texas, possess his Oklahoma birth certificate. Prior to moving to Kansas, Plaintiff was registered to vote in Tarrant County, Texas. He cancelled his Texas voter registration on December 3, 2015. On December 4, 2015, Plaintiff applied to register to vote in person at the Douglas County Election Office. He did not provide DPOC for two reasons: (1) he did not physically possess DPOC at the time of application; and (2) he does not agree with the law requiring DPOC. The Douglas County Clerk's Office accepted Plaintiff's application, but deemed it incomplete for failure to submit DPOC. Plaintiff's voter registration application was cancelled on March 4, 2016 under K.A.R. § 7-23-15.

Plaintiff possesses a Texas driver's license issued on January 7, 2016.

In Douglas County, an applicant who submits an incomplete voter registration application receives an initial letter of status, outlining the steps needed to provide DPOC, the methods for transmitting the documents, and a deadline for submission under K.A.R. § 7-23-15. The applicant receives a second notice approximately sixty days before the removal date, and a third notice approximately fourteen days before the removal date. Douglas County maintains a record of each mailing, and the mailings are also noted in ELVIS.[23] Since the effective date of the

---

[23]Defendant purports to controvert this fact by arguing that Douglas County also sends "weekly reminders to individuals to provide their citizenship documents." This is not a fair reading of Mr. Shew's response to Interrogatory No. 1. His response reads: "Once a week, our office also sends out postcards to applicants on the suspense list. A suspense applicant will receive a post card reminder approximately 60 days prior to her/his removal date and another postcard approximately 14 days prior . . . ." Doc. 163-17 at 2 (Pl. Ex. Q). Mr. Shew does not indicate that *each applicant* receives a weekly reminder. He clearly indicates that each week, his office sends out reminders; those reminders are sent to each applicant at the three intervals discussed that interrogatory response. This is consistent with the Secretary of State's recommendation that counties contact incomplete applicants "at least three times with [sic] the 90 day period." *Id.* at 3.

SAFE Act on January 1, 2013, there have been 3183 Douglas County applicants placed on the incomplete list. Of those applicants, 2035 have been resolved and registered. Douglas County has cancelled 812 applications since October 2, 2015. Of those applicants cancelled, Douglas County estimates that 75 have resubmitted applications.

## III. Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[24] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[25] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[26] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[27] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[28]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[29] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an

---

[24]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[25]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[26]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[27]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[28]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[29]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

essential element of that party's claim.[30]  Once the movant has met this initial burden, the burden

shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for

trial."[31]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[32]

Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence

in the event of trial from which a rational trier of fact could find for the nonmovant."[33]  To

prevail on a motion for summary judgment on a claim upon which the moving party also bears

the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could

find other than for the moving party."[34]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a

specific exhibit incorporated therein."[35]  Rule 56(c)(4) provides that opposing affidavits must be

made on personal knowledge and shall set forth such facts as would be admissible in evidence.[36]

The non-moving party cannot avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation.[37]  "Where, as here, the parties file cross-

motions for summary judgment, we are entitled to assume that no evidence needs to be

---

[30]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[31]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[32]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[33]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[34]*Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[35]*Adams*, 233 F.3d at 1246.

[36]Fed. R. Civ. P. 56(c)(4).

[37]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[38]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[39]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[40]

## IV.  Discussion

### A.     Standing

Defendant challenges Bednasek's standing to bring the constitutional claims remaining in this case.[41]  The Supreme Court has found the "irreducible constitutional minimum of standing" to contain three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result of the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[42]

Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing each element of standing "with the manner and degree of evidence required at the successive stages of

---

[38]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[39]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[40]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[41]Defendant previously moved to dismiss this case for lack of standing, which this Court denied.  *See* Docs. 94, 107.

[42]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

the litigation."[43]   Standing is evaluated based on the facts as they exist at the time the Complaint is filed.[44]   At the summary judgment stage of the proceedings, "the elements of standing must be set forth, through specific facts, by affidavit or other evidence.  Furthermore, a plaintiff must demonstrate standing separately for each form of relief sought."[45]

In deciding Defendant's earlier motion to dismiss, the Court found that Bednasek has standing to assert each of his remaining claims.  The Court addressed and rejected the argument, reiterated in Defendant's summary judgment motion, that Plaintiff suffers a self-inflicted injury by choosing not to produce DPOC in order to cure his deficient voter registration application. Defendant takes the position that the only way to achieve standing to challenge the DPOC law is if the plaintiff lacks access to any form of DPOC that would satisfy the statute.  The Tenth Circuit rejected this argument in the related case of *Fish v. Kobach.*[46]   Defendant argues that his argument here is "slightly different," citing language from the Tenth Circuit's decision in *ACLU of New Mexico v. Santillanes.*[47]

In *Santillanes*, the court considered an Albuquerque ordinance that required voters to present photo-identification when voting.  In discussing the defendant's standing challenge, the court explained: "the fact that Plaintiffs might be personally offended by the requirement of showing photo identification or philosophically opposed to it is insufficient to confer standing."[48] Nonetheless, the court found standing because the requirement that the plaintiffs present photo identification in order to vote, and the fact that this treatment did not apply to absentee voters,

---

[43]*Id.* at 561; *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

[44]*Tandy*, 380 F.3d at 1284.

[45]*Id.* (citations omitted).

[46]840 F.3d 710, 716 n.5 (10th Cir. 2016).

[47]546 F.3d 1313 (10th Cir. 2008).

[48]*Id.*

was sufficient to establish injury. Similarly, here Plaintiff claims unequal treatment as compared to residents who were born in the State of Kansas. Plaintiff further claims that he did not possess DPOC at the time he registered to vote and that his registration was in fact cancelled as a direct result of the allegedly unconstitutional law. He further claims that this cancellation prevented him from voting in the 2016 election. The Court finds that these injuries are sufficient to support Plaintiff's standing.

Defendant next argues that Plaintiff cannot establish redressability on the right to travel claim because this Court could not require other states to verify citizenship documents the way that Kansas agencies verify such records. And Defendant argues that Plaintiff's injury is self-inflicted and that he is not a Kansas resident. The Court has already addressed these arguments in a lengthy memorandum and order.[49] For the same reasons already explained in detail in that ruling, these arguments are unavailing. Plaintiff has met his burden of establishing standing to assert both remaining claims.

### B. Right to Vote

Plaintiff argues that the DPOC law unconstitutionally burdens his right to vote under the Fourteenth Amendment.[50] Plaintiff points to the lack of evidence that a substantial number of noncitizens have registered to vote, and argues that the law is not narrowly tailored to address the problem because it is both overinclusive and underinclusive. The parties disagree as to the level of scrutiny required on this claim. Plaintiff argues that strict scrutiny applies, while Defendant argues that a more deferential standard applies. The Supreme Court has made clear that there is

---

[49]Doc. 107 at 9–15.

[50]Plaintiff conceded at oral argument that this claim arises under the Equal Protection clause, and not the Due Process clause. The Court therefore need not address Defendant's arguments that there is insufficient evidence to support a due process claim in this matter.

no "litmus test" for considering a constitutional challenge to a State's election laws.[51]  Instead, the Court is to "first, consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate."[52]  Second, the court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule."[53]  In considering the State's interest, the Court is to both "determine the legitimacy and strength of each" State interest, and also "consider the extent to which those interests make it necessary to burden the plaintiff's rights."[54]  The Court has explained the balancing test as follows:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.  Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."  But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.[55]

In 2008, the Supreme Court decided *Crawford v. Marion County Election Board*, which considered a challenge to an Indiana law requiring its citizens to present photo identification ("photo-ID") when voting in-person.[56]  Indiana identified the following interests to justify the

---

[51]*See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Burdick v. Takushi*, 504 U.S. 428, 438–39 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

[52]*Anderson*, 460 U.S. at 789.

[53]*Id.*

[54]*Id.*

[55]*Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992); *Anderson*, 460 U.S. at 788) (citations omitted).  Plaintiff suggests that the *Anderson/Burdick* test does not apply here because the DPOC law is invidious—it is "unrelated to voter qualifications."  *Crawford*, 553 U.S. at 189.  Plaintiff points to the Tenth Circuit's determination in the related case of *Fish v. Kobach*, that Defendant was unable to overcome a presumption under the National Voter Registration Act ("NVRA") that an attestation of citizenship is the minimum amount of information necessary for Kansas to carry out its eligibility assessment and registration duties.  *See Fish v. Kobach*, 840 F.3d 710, 746–48 (10th Cir. 2016).  The Court is not persuaded that the Tenth Circuit's determination, in the context of a claim raised under the specific language of the NVRA, requires a finding in this case that the DPOC law is "invidious" as used in *Crawford*.

[56]*Crawford*, 553 U.S. at 185.

law's burden on voters: (1) deterring and detecting voter fraud; (2) election modernization; and (3) safeguarding voter confidence.[57]  As to voter fraud, the Court acknowledged no record evidence of in-person voter fraud (the only kind of fraud the statute could address) at any time in Indiana.[58]  However, the Court found that "flagrant examples of such fraud in other parts of the country," "occasional examples [that] have surfaced in recent years" in other places, and "Indiana's own experience with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor" involving the use of absentee ballots, "demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election."[59]  The Court found that the State's interest in preventing voter fraud was legitimate and proper.[60]  The Court also found that the State has an interest in modernizing elections, pointing to the NVRA and the Help America Vote Act ("HAVA"), which "indicate that Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology."[61]  Finally, the Court acknowledged the "independent significance" of the State's interest in public confidence in the integrity of the electoral process.[62]

In considering the burdens imposed by Indiana's photo-ID law, the Supreme Court distinguished between the types of burdens it imposes on voters.  Burdens "arising from life's vagaries," such as a lost or stolen wallet, are not constitutionally significant because "the

---

[57]*Id.* at 191.

[58]*Id.* at 194–95.

[59]*Id.* at 195 (footnotes omitted).

[60]*Id.* at 196.

[61]*Id.* at 193.

[62]*Id.* at 197.

availability of the right to cast a provisional ballot provides an adequate remedy."[63]  Instead, the Court considered burdens imposed on those who are eligible to vote, but who do not possess a photo ID that complies with Indiana law.  The Court found that the burden on this subgroup was low because Indiana issued free photo-ID cards to these individuals, and: "For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."[64]  The Court found that the evidence demonstrated a heavier burden was placed on elderly persons born outside of Indiana, persons who have difficulty obtaining a birth certificate required to obtain a photo-ID, homeless persons, and persons with religious objections to being photographed.[65]  However, the severity of the burden on these groups is "mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted.  To do so, however, they must travel to the circuit court clerk's office within 10 days to execute the required affidavit."[66]  The burden would only be a constitutional problem if it was "wholly unjustified," and even then, the burden on "just a few voters" would be insufficient to facially invalidate the statute.[67]

    In balancing the State's interests against the burden on voters, the Court stressed that instead of weighing the burden that the law imposes on all voters, the plaintiffs asked the Court to look at only a narrow group of voters that experienced a special burden.[68]  The Court found

---

[63]*Id.*

[64]*Id.* at 198 (footnote omitted).

[65]*Id.* at 199.

[66]*Id.*

[67]*Id.* at 199–200.

[68]*Id.* at 200.

that the evidence in the record was insufficient to quantify "either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified."[69]  The petitioners presented no evidence of the number of registered voters lacking a photo ID, or of the specific burdens felt by the categories of burdened voters identified by the Court.[70]  Moreover, those with difficulty obtaining a photo-ID, such as the elderly, could vote absentee without presenting photo-ID.   Thus, "on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters."[71]  The Court declined to invalidate the entire statute on this showing.[72]

In this case, Defendant first argues that Plaintiff fails to state a cognizable right to vote claim under the Equal Protection clause of the Fourteenth Amendment because the law does not create classifications that treat certain citizens differently.  He further suggests that, as such, the DPOC law should be considered an evenhanded restriction that is subject to the *Anderson/Burdick* test.  Plaintiff argues that the law is not a "generally applicable and evenhanded restriction" like the photo-ID law in *Crawford* because it is selectively enforced more harshly against recent migrants to Kansas.  Plaintiff also points out that the law in this case is a barrier to registration altogether, as compared to the safeguards present in *Crawford*— provisional ballots and absentee voting—that mitigated the burdens on voters in those cases.  Plaintiff argues that citizenship documents are less frequently maintained, compared to photo IDs, which individuals tend to keep on their persons, and that obtaining DPOC is a lengthier

---

[69]*Id.*

[70]*Id.* at 200–03.

[71]*Id.* at 202.

[72]*Id.* at 203.

process that often involves a fee.  Finally, the parties submit expert evidence about Kansans'

access to citizenship documents that would comply with the law.  Defendant argues that survey

evidence shows a large number of Kansans have such documents.  Plaintiff submits evidence

from Dr. Matthew Baretto, indicting the methodology and data behind Defendant's McFerron

survey.  Plaintiff argues that the law's burden on voters—disenfranchising 20,000 otherwise

eligible Kansas citizens—is not outweighed by the State's interest in combatting the negligible

problem of voter fraud.

There are genuine issues of material fact as to the burden imposed by the DPOC law in

this case.  Unlike the photo-ID cases largely relied on by Defendant that deal with requirements

for casting an in-person ballot, the DPOC law in this case applies to registration.  There is no

safety valve such as a provisional ballot that can serve to mitigate the burden on voters.[73]

Instead, the DPOC law is an absolute bar to registration for any applicant lacking access to

DPOC.  It is true that the law provides a potential safety valve in the form of subsection (m),

whereby an applicant could seek a hearing before the election review board.  But Plaintiff has

submitted evidence that this process may be even more burdensome than producing a form of

DPOC in the first instance.  And given that the hearing option has only been invoked three times

since the law was passed, the Court can infer that most applicants are unaware of this option.[74]

Another distinguishing feature of this case is that the number of incomplete and cancelled

registration applications for failure to submit DPOC provides concrete evidence of the magnitude

---

[73]*See, e.g.*, *id.* at 199–201; *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1323 (10th Cir. 2008); *Frank v. Walker*, 768 F.3d 744,  746 (7th Cir. 2014).

[74]The Court acknowledges the Tenth Circuit's language in *Santillanes* giving little weight to the plaintiff's argument there about the degree of voter education about the photo-ID law at issue in that case.  768 F.3d at 1322. But the Court does not read this language as broadly as Defendant.  There, the Court explained that "particularly in the absence of any indication that any voters would be or were confused" could not be "an adequate ground to invalidate this provision."  *Id.*  Here, the Court finds that the degree of voter education about the subsection (m) procedure is relevant to the burden analysis given Defendant's strong reliance on this option as a mitigating factor.

of the harm: these individuals all sought to register to vote but were blocked by the DPOC requirement. This evidence is in contrast to the voter-ID cases, where courts were unable to determine how many people were unable to vote based on the photo-ID requirement, and therefore found the burden to be speculative.[75]

Viewing the record in the light most favorable to Plaintiff, the magnitude of the DPOC law's burden—approximately 20,000 voter registration applications have been cancelled for failure to produce DPOC as of December 2016—indicates that Kansas voter registration applicants are more severely burdened than the voters subject to other states' laws requiring photo-ID for in-person voting.[76] It is reasonable to infer that a significant portion of these individuals were unable to complete their applications because they lack DPOC. And viewing the evidence in the light most favorable to Plaintiff, this moderate to severe burden cannot be outweighed by the summary judgment evidence supporting the State's interests in preventing voter fraud and promoting voter confidence. While it is true that under *Crawford*, the State's interests in preventing voter fraud and safeguarding voter confidence are legitimate and important, *Crawford* does not stand for the proposition that these interests presumptively outweigh a more-than-minimal burden imposed on voters by a State law.[77] The sheer magnitude

[75]*See Crawford*, 553 U.S. at 200; *Frank* 768 F.3d at 748–49.

[76]*See, e.g.*, *Crawford*, 553 U.S. at 200; *Frank*, 768 F.3d at 746–47 (noting lack of evidence of "substantial numbers of persons eligible to vote have tried to get a photo ID but been unable to do so."). The Court declines to engage in a prolonged discussion of the parties' expert evidence on burden. *See* D. Kan. R. 56.1. Defendant presented no statements of fact setting forth his expert's findings in his motion for summary judgment, despite referencing this survey evidence in his analysis. And while Plaintiff presented additional statements of fact concerning his rebuttal expert, they are of little value without evidence of Defendant's expert's findings. Any sort of battle of experts in this matter is properly handled through *Daubert* motions, and ultimately by the trier of fact.

[77]*See, e.g.*, *Crawford*, 553 U.S. at 202 (weighing state interest against "limited burden on voters' rights."); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 606–07 (4th Cir. 2016) (upholding photo-ID law that imposed lesser burden than law discussed in *Crawford* based on same State interests); *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 391–92 (9th Cir. 2016) (explaining that when burden is minimal, the State does not need to show that the law is narrowly tailored); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (upholding early voting law after weighing state interest against "minimal burden that some voters may experience."); *Frank*, 768 F.3d at 749 ("Because the burden of getting a photo ID in Wisconsin is no greater than the burden in Indiana, the

of potentially disenfranchised voters impacted by the DPOC law and its enforcement scheme cannot be justified by the scant evidence of noncitizen voter fraud that occurred in Kansas before the law was passed, or by the State's interest in promoting public confidence in elections. Given the genuine material factual disputes about the severity of the burden involved, the Court denies Defendant's motion for summary judgment on this claim.

## C. Right to Travel Claim

Plaintiff also raises a claim that the DPOC statute, and the State's efforts to verify Kansas birth records for individuals on the incomplete list,[78] apply differently to Kansas citizens depending on their length of residency and state of birth, burdening their fundamental right to travel under the Privileges or Immunities Clause of the Fourteenth Amendment. The parties filed cross-motions for summary judgment on this claim.[79] Plaintiff argues that the statute and its enforcement regime discriminate against new registrants born outside of the State of Kansas, in violation of the Fourteenth Amendment's Privileges or Immunities clause. Defendant argues that there is no legal basis for either a facial or as-applied challenge to the law.

The right to travel is a fundamental right under the Constitution, and "protects residents of a State from being disadvantaged, or from being treated differently, simply because of the

---

district court's constitutional holding must rest on its finding that photo IDs do not serve any important purpose—for if that's right, then under the constitutional standard laid out in *Crawford* even a modest burden is forbidden.").

[78]Plaintiffs refer to this as a challenge to the "Birth Link MOU," which is the interagency agreement between the Secretary of State's Office and the KDHE, whereby the KDHE will verify birth and marriage records for those individuals who apply to register to vote who were born in Kansas and would otherwise be denied registration due to failure to provide DPOC.

[79]There are cross-motions on the theory that the DPOC law, as enforced through the KDHE verification policy, is unconstitutional. Other than a passing reference to the grandfather clause in his opening brief, Plaintiff does not move for summary judgment on this claim. *See* Doc. 141 at 15. Instead, he raises the argument in response to Defendant's motion for summary judgment. Doc. 147 at 41–42.

timing of their migration, from other similarly situated residents."[80]  In *Saenz v. Roe*,[81] the

United States Supreme Court explained that the right to travel has three components:

> It protects the right of a citizen of one State to enter and to leave another State, the
> right to be treated as a welcome visitor rather than an unfriendly alien when
> temporarily present in the second State, and, for those travelers who elect to
> become permanent residents, the right to be treated like other citizens of that
> State.[82]

As with the durational residency requirement at issue in *Saenz*,[83] this case implicates the third

category of the right to travel.

The fact that a law may only incidentally implicate the right to travel is not a defense

because "since the right to travel embraces the citizen's right to be treated equally in her new

State of residence, the discriminatory classification is itself a penalty."[84]  Supreme Court cases

dealing with indirect burdens on the right to travel address "state laws that, by classifying

residents according to the time they established residence, resulted in the unequal distribution of

rights and benefits among otherwise qualified bona fide residents."[85]  Strict scrutiny is most

frequently applied in the context of durational residency requirements.  In *Saenz* for example, the

Court invalidated a California statute that made new California residents ineligible to receive

welfare benefits during their first year of residency.[86]  During that first year, new residents could

only obtain welfare benefits equivalent to what they would have received in their prior State of

residence.[87]  The State's interest in deterring welfare applicants from migrating to California was

---

[80]*Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 901, 904 (1986).

[81]526 U.S. 489 (1999).

[82]*Id.* at 499.

[83]*Id.* at 502.

[84]*Id.* at 505.

[85]*Soto-Lopez*, 476 U.S. at 903.

[86]*Saenz*, 526 U.S. at 510–11.

[87]*Id.* at 492–93.

impermissible and unsupported by the record.[88]  The Court also found that California's fiscal justification for the law did not justify its decision to discriminate against new residents from certain states.[89]

In 1972, the Court struck down Tennessee's one-year durational residency requirement on the right to vote in *Dunn v. Blumstein*.[90]  Finding that the Tennessee law deprived new residents the fundamental political right to vote, the Court applied a "strict equal protection test: [durational residence laws] are unconstitutional unless the State can demonstrate that such laws are 'necessary to promote a compelling governmental interest."[91]  Strict scrutiny applied because the law "forc[ed] a person who wishes to travel and change residences to choose between travel and the basic right to vote."[92]  The Court found that the statute was not narrowly tailored to further either the State's interests in preventing voter fraud, or having knowledgeable voters, and thus invalidated the law.[93]  The Court made clear that the State must demonstrate that the law is narrowly tailored to meet the State's legitimate objections, and that "if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.  If is acts at all, it must choose 'less drastic means.'"[94]

In *Zobel v. Williams*,[95] the Court addressed a slightly different law tied to length of residency.  The Alaska statute at issue in that case provided for dividend distributions to State

---

[88]*Id.* at 506.

[89]*Id.* at 507.

[90]405 U.S. 330 (1972).

[91]*Id.* at 342 (quoting *Shapiro*, 394 U.S. at 634).

[92]*Id.* at 341.

[93]*Id.* at 344–61.

[94]*Id.* at 343 (quoting *Shelton v. Tucke*, 364 U.S. 479, 488 (1960)).

[95]457 U.S. 55 (1982).

residents from a Fund the State established to deposit a portion of its mineral income each year. The statute distributed the dividends based on each adult resident's length of residency. Given the fixed, permanent residency classifications created by the statute, the Court held that the law was subject to strict scrutiny.[96] The Court determined that the State's interest in creating incentives for individuals to maintain residence in Alaska, and to prudently manage the Fund, were not even rationally related to its classifications.[97]

Plaintiff argues that two aspects of the DPOC law violate the right to travel: (1) the law only applies to those registering to vote for the first time after January 1, 2013, which favors established residents who registered before that date; and (2) the DPOC law and the Birth Link MOU together form a system in which the DPOC requirement is enforced exclusively against those born outside of Kansas. The Court considers each in turn.

### 1. The Grandfather Clause (Facial Challenge)

In response to the Defendant's motion for summary judgment, Plaintiff offers a theory of relief not included in his own motion for summary judgment: that the grandfather clause in K.S.A. § 25-2309(n) discriminates against new Kansas residents by exempting from its requirements Kansas residents who were already registered to vote as of January 1, 2013.[98]

Defendant first objects that this right to travel theory was not pled, and is therefore waived. The Pretrial Order was entered in this case on November 15, 2016,[99] before the summary judgment motions were filed. The Pretrial Order "controls the course of the action

---

[96]*Id.* at 60.

[97]*Id.* at 60–65.

[98]*See* Doc. 141 at 22–24 (restricting its discussion of the Privileges or Immunities claim to the KDHE agreement).

[99]Doc. 138.

unless the court modifies it."[100] "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[101] It is true that the Pretrial Order should be "'liberally construed to cover any of the legal or factual theories that might be embraced by their language.' But the primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'"[102]

The Court has reviewed the Pretrial Order and concludes that it did not place Defendant on notice that Plaintiff was pursuing a facial challenge based on subsection (n) of the statute under the Privileges or Immunities Clause of the Fourteenth Amendment. This is not a case where the Privileges or Immunities claim was so broadly worded that this theory of relief could be inferred if liberally construed. The Third Amended Complaint details Plaintiff's Privileges or Immunities claim in Count V, and repeatedly refers to Defendant's actions to "independently verify the citizenship of individuals on the suspense list who were born in Kansas."[103] The Pretrial Order amends Count V only as follows:

> Defendant's independent actions to verify citizenship discriminates [sic] against Kansas residents born or married outside the State of Kansas. Such discrimination against those who have moved into Kansas from out of state violates the right to travel protected by the Fourteenth Amendment of the Constitution and recognized by the United States Supreme Court. Under color of state law, defendant[] has deprived plaintiff of his constitutional right to travel in violation of 42 U.S.C. § 1983.[104]

The Court simply cannot read either the Third Amended Complaint or the Pretrial Order as placing Defendant on notice that Plaintiff would pursue this theory of relief. Certainly, by late

---

[100]Fed. R. Civ. P. 16(d).

[101]*Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

[102]*Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979), and *Cortez*, 460 F.3d at 1276).

[103]Doc. 88 ¶ 76; *see also* ¶¶ 77–80.

[104]Doc. 138 at 11.

November, Plaintiff should have disclosed to Defendant his general claims of relief. The fact that it was not disclosed until the response to Defendant's summary judgment motion certainly caused him prejudice. Notice that the scope of Plaintiff's Privileges or Immunities claim went beyond the verification procedure with the KDHE would have certainly affected Defendant's discovery strategy—the Court assumes he would have marshalled statistical information about the types of Kansas residents affected by the grandfather clause, for example. And Defendant would have moved for summary judgment on Plaintiff's facial challenge to the statute instead of being forced to address it solely in the reply brief. The Court agrees with Defendant that this claim has been waived.

Even if the Court allowed the grandfather clause theory to proceed, the Court would grant summary judgment in favor of Defendant on the merits. It is true that durational residency laws are subject to strict scrutiny because they have been deemed a "classification which serves to penalize the exercise of" the right to travel.[105] But the Court agrees with Defendant that there are important differences between the DPOC law's grandfather clause and durational residency requirements such as those in *Saenz* and *Dunn*. As an initial matter, the DPOC law does not amount to the outright denial of a benefit or right to new residents. The law creates an additional requirement on voter registration applicants who register for the first time after January 1, 2013. But unlike the durational residency requirements subject to strict scrutiny in those cases, the DPOC law's grandfather clause is not defined by length of residency.[106] Instead, the grandfather

---

[105] *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 339 (1972); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 497 (10th Cir. 1998).

[106] *See Saenz v. Roe*, 526 U.S. 489, 505 (1999) (explaining that the subject law's classifications "are defined entirely by (a) the period of residency in California and (b) the location of the prior residence of the disfavored class members."); *Dunn*, 405 U.S. at 334 (reviewing law that denied right to vote to Tennessee residents who resided in the State for less than one year); *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612 (1985) (reviewing tax exemption law that favored Vietnam veterans that have lived in New Mexico for a fixed minimum period); *Zobel v. Williams*, 457 U.S. 55, 61 (1982) (reviewing law that distributed benefits based on "fixed, permanent distinctions between an ever-increasing number of perpetual classes of concededly bona fide residents, based on how long they have been in

clause states that the new law will not apply to <u>any person</u> who was already <u>registered to vote</u> in Kansas on or before January 1, 2013.  Based on the figures provided on summary judgment, more than 1.4 million registered voters in Kansas were exempted from the DPOC requirement by operation of the grandfather clause. To be sure, the grandfather clause effectively requires residents who move to Kansas after January 1, 2013, to submit DPOC when registering to vote for the first time.  But it treats nonresidents and residents equally if they were not registered prior to the effective date.  Newly established residents are not the only group impacted by the grandfather clause.  The law also affects all Kansas residents who were not yet eighteen years old on January 1, 2013, and all Kansas residents who were eligible to vote but chose not to register prior to the effective date.

As the Seventh Circuit has explained:

Grandfather provisions always grant preferences to a special group, and newcomers or those who never arrive in the favored area rarely share the benefits. We recognize that such clauses create a risk of political exploitation working to the disadvantage of unfavored classes, and courts must certainly scrutinize grandfather clauses to learn whether they are masks for exploitation or invidious discrimination.

However, in challenging a grandfather clause such as that incorporated in the handgun ordinance here, plaintiffs cannot invoke compelling governmental interest scrutiny by showing only that new residents will not share its benefits. Grandfather clauses almost always favor established residents or businesses over newer ones.  Where the purpose of the grandfather clause is the protection of reliance interests, only established residents or businesses will have relied on prior laws and thus will have reliance interests to protect.

If compelling governmental interest scrutiny were appropriate based merely on a showing that newer residents would not benefit from the provision, then virtually any grandfather clause would be vulnerable under that exacting standard.  Few would be likely to withstand scrutiny.  Yet grandfather provisions are a familiar means in the law for protecting reliance interests, and we are reluctant to unsettle these provisions by applying an unnecessarily demanding standard of review.

---

the State."); *see also Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 214 (3d Cir. 2013) ("When the receipt of a government benefit is conditioned on factors other than duration of residency, we apply rational basis review to determine whether the right to travel has been unconstitutionally burdened.").

> Where plaintiffs can show that a grandfather provision impinges on a fundamental personal right (other than through its indirect effects on those who travel), or that the provision is a substitute for a suspect form of discrimination, courts should apply the compelling governmental interest standard.[107]

The Court finds that the grandfather clause in the Kansas DPOC law itself does not impinge on a fundamental right other than the indirect effect on the right to travel, and that it is not masking a suspect form of discrimination.[108]  It does not create a strict classification based solely on residency.  Thus, the Court applies rational basis review.

On rational basis review, the Court considers whether the DPOC law's grandfather clause "rationally furthers a legitimate governmental purpose."[109]  Defendant argues that the State had a compelling interest in avoiding logistical difficulties with deregistering and then re-registering over one million voters when the DPOC law became effective.  He further asks the Court to rely on the Seventh Circuit's analysis in *Sklar*, which includes a finding that Chicago had a legitimate interest in protecting those who relied upon the prior law allowing residents to possess, purchase, and register handguns.[110]  The Court agrees that these are legitimate state interests.

The Court also agrees that the grandfather clause here rationally furthers the State's legitimate purposes by restricting the law's applicability to those residents who registered to vote

---

[107]*Sklar v. Byrne*, 727 F.2d 633, 639 (7th Cir. 1984) (citations omitted).

[108]While Plaintiff certainly challenges § 25-2309(l) as infringing on the fundamental right to vote, the grandfather clause in subsection (n) is not part of that challenge.  In *Dunn*, the Court found that the durational residency requirement represented "a separate voting qualification imposed on bona fide residents."  405 U.S. at 344.  Strict scrutiny applied because the law at issue imposed a penalty only on those who recently exercised their right to travel.  *Id.* at 3412.  Here, the grandfather clause is not a separate voting qualification for nonresidents.  It exempts from the  law only those residents who complied with the prior law before the effective date.  Residents who did not comply, whether by choice or not, are subject to the law.  Moreover, the DPOC law, unlike the durational residency requirement in *Dunn*, is not a prohibition on the right to vote for new residents; it is an additional registration requirement.  *See id.* at 341 (explaining "[t]he right to travel is merely penalized, while the right to vote is absolutely denied."); *Connelly*, 706 F.3d at 214 ("strict scrutiny applies when the state conditions the receipt of certain government benefits on the duration of the recipient's residence in the state.").

[109]*Sklar*, 727 F.2d at 639 (citing *Dukes*, 427 U.S. at 303).

[110]*Id.* at 641–42 ("the city's purpose in protecting the reliance interests of those who purchased and registered handguns in Chicago was a legitimate purpose."); *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 531 (6th Cir. 1998) ("the governmental interest at stake here is clearly legitimate.").

after January 1, 2013.  Again, the law does not apply a durational residency requirement, it applies only to those who had not previously availed themselves of the prior law.  The DPOC law, which was passed in 2011, thus allowed Kansas residents who had already complied with the prior registration law not to deregister and re-register, but instead to rely upon the law as it existed at the time of their registration.[111]  And the law allowed those who had not yet registered a grace period of almost two years between the law's passage in 2011, and its effective date in 2013, to register without providing DPOC.  Although the grandfather clause indirectly affects new residents, among other groups of eligible voters, the Court easily finds that the provision is rationally related to the state's legitimate purpose of protecting the reliance interests of those who had already registered to vote when the law was passed, and the administrative interests in reducing the amount of applicants that must be processed when the law became effective.  The Court grants Defendant's motion for summary judgment on this claim.

### 2.    Interagency Cooperation with the KDHE  (As-Applied Challenge)

Plaintiff maintains that Defendant's interagency agreement with the KDHE, whereby he verifies incomplete voter registration applicants' citizenship by cross-referencing Kansas birth and marriage records, discriminates against individuals not born in Kansas and therefore violates the Fourteenth Amendment.  This is an as-applied challenge to the law because the interagency enforcement mechanism is not part of the statute itself.  Plaintiff argues that strict scrutiny applies to determine whether Defendant's enforcement of the DPOC law violates the Privileges or Immunities clause because the interagency practice only benefits applicants born in Kansas, and because, like *Dunn*, it implicates the right to vote.  Defendant argues that his enforcement

---

[111]Although not discussed by Defendant, the Court is also cognizant that an attempt by Defendant to deregister Kansas residents would have likely run afoul of the NVRA, which governs the circumstances under which a State may remove a person's name from its official list of voters.  *See* 52 U.S.C. § 20507 (providing the limited circumstances under which the name of a registrant may be removed from the official list of eligible voters).  The State has a compelling interest in complying with federal election law.

efforts treat all Kansas citizens equally and therefore, they should be subject to rational basis review.

Before determining the appropriate standard of review to apply, the Court notes the limits of Plaintiff's as-applied challenge. Plaintiff does not challenge the scope of the law at the time of registration, i.e., it is undisputed that the DPOC law applies and is enforced against all Kansas residents who register after the effective date, regardless of the length of their residency. All Kansas residents are placed in suspense status if they fail to provide DPOC with their voter registration application. Instead, Plaintiff challenges the "back end" verification efforts used by Defendant to whittle down the list of applicants on the incomplete list. Defendant has exercised his statutory authority[112] to obtain and verify citizenship documents for incomplete applicants by entering into agreements with both the KDHE and the KDOR. These agreements allow Defendant to periodically run the list of incomplete applications through those agencies' databases to determine if they have qualifying citizenship documents on file. Additionally, the KDOR has created a web portal so that Defendant's office and county election offices can manually query for citizenship documents. If they are able to confirm DPOC through one of these sources, the incomplete application is deemed completed and the applicant is registered to vote. Defendant argues that because he attempts to verify citizenship for everyone on the incomplete list, regardless of where they are born, his enforcement efforts cannot be construed to discriminate against those not born in Kansas. He also points out that the KDOR verification process would apply to any resident that had submitted DPOC during the driver's license application process, with no limitation on length of residency or place of birth.

---

[112]K.S.A. § 25-2309(t).

To trigger strict scrutiny, Plaintiff needs to demonstrate that Defendant's agreement with the KDHE discriminates against Kansas residents who were not born in Kansas.[113]  It is undisputed that the KDHE only maintains birth records for individuals born in the State of Kansas.  And the evidence demonstrates that between 40 and 50% of applicants who are deemed incomplete are eventually completed automatically after Defendant runs the list of names against the KDHE's database.  Regardless of whether Defendant is aware of the state of birth for each applicant, the face of the interagency agreement makes clear that he could only expect to find matches to Kansas-born citizens through this verification process.

Perhaps if KDHE verification happened at the time of application, and was Defendant's only effort to verify DPOC, this Court would review Defendant's enforcement efforts under strict scrutiny because the enforcement scheme would essentially exempt those who were born in Kansas from manually providing DPOC at the time of application.  But the procedure does not apply automatically at the time of application, and the Court declines to evaluate Defendant's KDHE agreement in a vacuum.  All Kansas citizens, regardless of the duration of their residency, are required to produce DPOC at the time they apply to register to vote.  Plaintiff Bednasek was not subject to a different requirement than a Kansas resident who was born in Kansas.  And it is undisputed that Defendant also verifies citizenship documents on file with the KDOR as part of his efforts to confirm citizenship of those on the incomplete list.  Indeed, Defendant contends that a previously dismissed Plaintiff, Alder Cromwell, was registered after verifying his citizenship through the KDOR.  The KDOR verification process is not limited to those born in Kansas, nor to established residents.  Plaintiff has provided no response to this argument.[114]

---

[113]*Saenz v. Roe*, 526 U.S. 489, 504 (1999).

[114]Plaintiff makes the conclusory allegation in his reply brief that "KDOR does not have verification documentation for anyone who has not previously filed taxes in Kansas."  Doc. 154 at 15.  But he provides no citation to support this statement, nor further develops this argument in any of his submissions.

Given Defendant's evidence that his efforts to verify citizenship for incomplete voter registration applicants include verifying any Kansas resident that obtains a Kansas driver's license, the Court cannot find that Defendant's enforcement efforts create a classification based on length of residency. Again, there is no facial residency requirement in the statute. Instead, Plaintiff challenges an interagency memorandum that applies only to Kansas residents who lack DPOC and thus find themselves in incomplete status. Defendant has established interagency cooperation with both the KDHE and the KDOR to attempt to verify DPOC that may be on file for any individual on the incomplete list. Although the KDHE only maintains records for Kansas-born citizens, the KDOR maintains records without regard to state of birth or length of residency. The Court therefore finds that Defendant's KDHE agreement is subject to the rational basis test.[115] The policy will survive rational basis scrutiny if it "rationally furthers a legitimate state purpose."[116]

Defendant offers several State interests to justify his agreement with the KDHE. First, he argues that other state's agencies have declined to share their birth records with his office, and that he cannot compel them to conduct verifications. Second, he cites operational efficiency. Third, Defendant argues that his enforcement efforts potentially avoid violations of the NVRA by removing the risk that an applicant duplicates his proof of citizenship. Finally, Defendant argues that the State has a compelling interest in ensuring the integrity of the election process.

The Court must evaluate the State's interests furthered by the KDHE policy—the policy challenged by Plaintiff on this claim—not the DPOC law in general. While the State's interests in combatting voter fraud or ensuring the integrity of the election process may or may not be served by the DPOC law, Defendant does not explain how the KDHE policy furthers that goal.

---

[115] *See, e.g.*, *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 214 (3d Cir. 2013).

[116] *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 618 (1985).

While the agreement certainly allows Defendant to verify citizenship of individuals born in Kansas, there are at least 20,000 individuals who could not be verified through this effort. And Defendant fails to explain how the act of verifying citizenship for only the Kansas-born residents on the suspense list ensures the integrity of the election process. There is no evidence that these Kansas-born citizens are any more qualified than citizens born in other states.

But the Court finds that Defendant has demonstrated a legitimate State interest in administering the DPOC law efficiently, and that verifying birth records in other states is not feasible. First, the State undoubtedly has a legitimate interest in efficiently administering the DPOC law, and also in ensuring that qualified applicants for whom the State already possesses citizenship documents are registered to vote. While it may be true that it is more burdensome for a non-Kansas born citizen to have an incomplete voter registration application in Kansas, the Court finds that this burden is not unreasonable in the context of the law's enforcement as a whole. And this slightly more onerous burden on incomplete voter registration applicants not born in Kansas is justified by the State's legitimate interest in administering the DPOC law efficiently and verifying citizenship for those qualified applicants for whom the State already possesses DPOC. Moreover, Defendant has demonstrated that he has explored other methods of verifying birth records for Kansas citizens born in other States, but that these options are not feasible. Caskey has contacted several neighboring states in an attempt to obtain birth certificate information, but either their state laws prohibit such information sharing, or it would be cost-prohibitive—"in the thousands of dollars per record."[117] These showings are sufficient to demonstrate that the State's interest in efficiently administering the DPOC law are rationally related to the KDHE policy.

---

[117]Doc. 156-4, at 142:3 (Def. Ex. C).

The Court grants Defendant's motion for summary judgment on this Privileges or Immunities claim because there is no genuine issue of material fact that Defendant's attempts to verify citizenship of Kansas residents on the list of incomplete voters does not unreasonably burden the right to travel. Because Defendant's enforcement efforts do not create a classification that discriminates against Kansas citizens based on their length of residency, the Court applies rational basis review to Defendant's interagency agreement with the KDHE. Under this review, the Court finds that the State's legitimate interest in administering the DPOC law efficiently is furthered by its policy to verify DPOC that may be on file in Kansas, whether it is on file with the KDHE or the KDOR.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Summary Judgment (Doc. 141) is **denied**. Defendant's Motion for Summary Judgment is **granted in part and denied in part**. Defendant's motion is granted on Plaintiff's right to travel claim and denied on the right to vote claim.

**IT IS FURTHER ORDERED BY THE COURT** that the June 5, 2017 trial date in this matter is continued. In the interest of judicial economy, the Court will set this matter for a telephonic status conference to discuss resetting a trial date in coordination with the parties in *Fish v. Kobach*, Case No. 16-2105.

**IT IS SO ORDERED.**

Dated: May 4, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE