## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| **PARKER BEDNASEK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-9300-JAR-JPO |
| v. | ) | |
| | ) | |
| **SCOTT SCHWAB, KANSAS** | ) | |
| **SECRETARY OF STATE,** | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF BEDNASEK'S MEMORANDUM IN SUPPORT OF HIS
### MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES INCURRED

Comes now Plaintiff Parker Bednasek ("Plaintiff"), by his undersigned counsel, and in support of his Motion to an Award of Attorneys' Fees and Expenses, states the following:

Pursuant to Rule 54(d), Fed. R. Civ. P., 42 U.S.C. § 1988(b), 52 U.S.C. § 10310(e), and this Court's Order of July 2, 2018 (Docket No. 222),[1] Plaintiff has respectfully moved for an order awarding him, as the prevailing party in this case, reasonable attorneys' fees, reasonable expert fees, and other reasonable litigation expenses, the amounts and grounds for which are specified in this Memorandum and attached declarations and exhibits. Pursuant to this Court's Rule 54.2(a),

---

[1] This Court's July 2, 2018 order granted the parties' Joint Motion for an Order Holding in Abeyance Proceedings Regarding Attorney's Fees and Expenses, which asked the Court to hold all fee request issues in abeyance for 45 days after the conclusion of any appellate proceedings because, among other reasons, "[t]he final amount of Plaintiff's fees request will depend on the time spent on the anticipated appeal to the Tenth Circuit and any subsequent proceedings." Docket No. 221, ¶ 4. This Court therefore ordered that "[m]otions for fees and related expenses shall be filed within 45 days from the date of final resolution of any appeal, including any petition for a writ of certiorari in the U.S. Supreme Court . . . filed in relation to this action." Docket No. 222.

Plaintiff will initiate consultation with Defendant[2] promptly after the filing of this motion, and will provide a report on that consultation to the Court within thirty days of the filing hereof.

## INTRODUCTION AND SUMMARY

Congress enacted the above fee-shifting provisions because it recognized that constitutional and civil rights protections, including voters' rights, require private enforcement. "Private attorneys general" are needed "to advance the public interest by invoking the injunctive powers of the Federal courts," and fee awards for those who prevail are "an essential remedy if private citizens are to have a meaningful opportunity to vindicate" those rights. S. Rep. 94-1011, 3, 1976 U.S.C.C.A.N. 5908, 5910. This is precisely the sort of case in which a substantial award is merited, for several reasons.

**First, Plaintiff has prevailed completely.** Plaintiff sued to invalidate Kansas's documentary proof of citizenship ("DPOC") statute, K.S.A. § 25-2309(l). This Court granted Plaintiff the declaratory and injunctive relief he sought, holding the DPOC statute facially invalid. *Fish v. Kobach,* 309 F. Supp. 3d 1048, 1106-14, 1119 (D. Kan. 2018). The Tenth Circuit affirmed this Court's judgment in all respects, *Fish v. Schwab,* 957 F.3d 1105 (10th Cir. 2020). The Supreme Court denied Defendant's petition for certiorari, *Schwab v. Fish,* No. 20-109, 2020 WL 7327906 (U.S. Dec. 14, 2020).

**Second, Plaintiff's victory represents an important and ground-breaking vindication of the constitutional rights of all Kansans — indeed, of the constitutional rights of eligible voters throughout the United States.** This Court found that the DPOC law disenfranchised eligible voters on a massive scale, both by resulting in the denial of over 31,000 voter registration

---

[2] During the five-year history of this case, successive Secretaries of State of Kansas have defended Kansas' DPOC law. For purposes of simplicity, this memorandum refers to the various Secretaries of State, without distinction, as "Defendant."

applications in Kansas in just over three years, 309 F. Supp. 3d at 1067, and by deterring many more eligible Kansas voters from attempting to register, *id.* at 1109-10. In related litigation, the Tenth Circuit characterized its effect as a "mass denial of a fundamental constitutional right." *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016). Plaintiff's counsels' efforts have eliminated that impediment to democracy (and source of substantial costs and burdens for administrators and voters) in Kansas. They have also generated the first appellate precedent on an issue — the constitutionality of DPOC laws — that Defendant rightly called "an important question of federal law" when he petitioned for Supreme Court review. *Schwab v. Fish*, No. 20-109, Pet. for Cert. at 12, 2020 WL 4450464, *12 (U.S. filed July 28, 2020). The nationwide significance of Plaintiff's victory is reflected in the filing by 18 states' attorneys general of an amicus brief supporting Defendant's unsuccessful petition for certiorari. *See Schwab v. Fish*, No. 20-109, Br. of Texas, *et al.*, 2020 WL 5370468 (U.S. filed Sept. 2, 2020).

**Third, Plaintiff's precedent-setting victory is the product of more than five years of exceptionally challenging, efficient, and well-documented litigation work, as detailed below.** The constitutional and election law issues raised were novel and complex, requiring a high level of expertise. The factual and expert evidence was voluminous, leading to a seven-day trial and 35 Federal Supplement pages of factual findings by this Court, 309 F. Supp. 3d at 1061-96, and the consolidation of the *Bednasek* case with the *Fish* case added additional complications, which Plaintiff's counsel handled efficiently and successfully. And the cost and burden of litigation was greatly exacerbated by the need to respond to the Defendant's persistent scorched-earth litigation tactics, including filing unsuccessful standing and discovery motions, violating discovery obligations, proffering unqualified and unreliable expert witnesses (both for depositions and trial testimony), appealing this Court's decision, and seeking certiorari.

Given the novelty of the issues, the specialized nature of the work, the difficult and drawn-out nature of the five-year-long litigation process, the importance and scope of the constitutional rights vindicated, and Plaintiff's complete success, this is the kind of "rare and exceptional" case in which "superior attorney performance" merits an "enhanced award" in excess of the traditional "lodestar calculation." *Perdue v. Kenny A., ex rel Winn,* 559 U.S. 542, 544-46 (2010).

This request employs the lodestar method. The attached declarations and exhibits fully document Plaintiff's counsels' hours and expenses, and reflect an exercise of billing discretion in excluding from the amounts claimed all time worked by attorneys who devoted less than fifty hours of work to the case, reducing the amount sought by at least $7,000.00, plus all work performed by paralegals, further reducing the total by over $10,000.00. Only five Dentons lawyers billed more than fifty hours to the case, showing that Plaintiff staffed the case efficiently, with no time spent by lawyers coming in mid-stream having to familiarize themselves with the case. And in fact when the case went to trial, only two lawyers from Dentons and one from Fagan Emert appeared at the trial, and only three Dentons lawyers billed time on the appellate work at the Tenth Circuit and the Supreme Court. Mr. Johnson and Mr. Woods worked on the case from start to finish, and Mr. Steel only came in when the need arose for a Supreme Court specialist. The hourly rates sought are far below the rates counsel would charge a paying client, and below prevailing market rates, for the high-level, specialist election law, constitutional law and appellate legal services provided.

As detailed below, using the lodestar method, Plaintiff's request totals $703,268.75 in attorneys' fees and $21,239.55 in expenses. Those amounts should be awarded in full, and the Court should consider an enhancement of the award.

## SUMMARY OF CLAIMS AND PROCEDURAL HISTORY

This case was filed in the fall of 2015. Throughout its five-year history, Plaintiffs (of whom only Bednasek remains a party) and their counsel pursued a single goal: the constitutional invalidation of K.S.A. § 25-2309(l). That goal was finally and fully achieved when the Supreme Court denied Defendant's petition for certiorari on December 14, 2020.

Defendant used every means possible to prevail in this case, making this litigation much more expensive and drawn-out than it needed to be. First, Defendant attempted to moot this case by registering the original Plaintiffs, Alder Cromwell and Cody Keener, through the back door and without their knowledge. (Neither had produced DPOC when they registered to vote, so Defendant obtained proof of their births in Kansas directly from the Bureau of Vital Statistics, without informing either Plaintiff.) *See* Docket Nos. 22-24.

Second, when Plaintiff Bednasek entered the case, Defendant made meritless claims that he lacked standing because (Defendant wrongly alleged) he was not a resident of Kansas or because he intentionally refused to comply with the law. *See* Docket No. 94. Defendant made these groundless arguments before the District Court, the Court of Appeals, and the Supreme Court, losing in each of these courts.

Third, the parties engaged in lengthy discovery. Many interrogatories were exchanged, thousands of pages of documents were produced, and many depositions were taken. Plaintiffs in the *Fish* case and this case and Defendants each submitted four expert reports, all eight experts were deposed, and the parties litigated five motions to exclude expert testimony. Defendant engaged in discovery tactics that required the Court's intervention on several occasions, ultimately leading to an award of sanctions against Defendant. *See Fish,* 309 F. Supp. 3d at 1114-19.

Fourth, the parties filed cross-motions for summary judgment (Docket Nos. 141-43); Defendant prevailed on some points but lost on the most important question: the viability of

Plaintiff's Fourteenth Amendment claim.  As a matter of billing discretion, Plaintiff's counsel have excluded from the current fee request 25% of the fee amount of work that was devoted to the summary judgment briefing and argument  In essence, this reduction constitutes 25% of the attorney hours worked between November 10, 2016, the date on which the detailed work entries first mention summary judgment-related work, and March 3, 2017, the date of the arguments on summary judgment before the Court.  This reduces the fees sought by $26,981.25.  Fagan Emert's requested fee was reduced by $2,472.50 as a consequence of this reduction.   After the argument of the  summary judgment motions on March 3, 2017, the parties' efforts were *solely* focused on the constitutional claim on which Plaintiff prevailed at trial and on appeal.

## APPLICABLE LEGAL STANDARDS FOR
## ATTORNEYS' FEE AND EXPENSES AWARDS

Both 42 U.S.C. § 1988, which authorizes the award of attorney's fees and expenses to prevailing plaintiffs in civil rights cases, and 52 U.S.C. § 10310(e), which authorizes the award of attorney's fees and expenses to prevailing plaintiffs in voting rights cases, are intended to encourage and enable "private attorneys general" to enforce fundamental rights, and they are construed identically.  *See, e.g., Davis v. Abbott,* 781 F.3d 207, 213 n.6 (5th Cir. 2015); *Donnell v. United States,* 682 F.2d 240, 245 n.7 (D.C. Cir. 1982); *Riddell v. Nat'l Dem. Party*, 624 F.2d 539, 543 (5th Cir. 1980).  Under both statutes, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Lefemine v. Wideman,* 568 U.S. 1, 5 (2012) (under § 1988); *Donnell,* 682 F.2d at 245 (under § 10310(e)).  "Accordingly, a 'district court's discretion to deny fees to a prevailing plaintiff is quite narrow.'" *Zinna v. Congrove,* 680 F.3d 1236, 1239 (10th Cir. 2012) (citations omitted); *accord Phelps v. Hamilton*, 120 F.3d 1126, 1129 (10th Cir. 1997); *Kansas Judicial Watch v. Stout*, 2012 WL 1033634, *3 (D. Kan. 2012).

A plaintiff is deemed a prevailing party "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Lefemine*, 568 U.S. at 4; *Farrar v. Hobby*, 506 U.S. 103, 111–112 (1992). In determining whether a plaintiff is a prevailing party, as opposed to merely achieving "technical success," courts in the Tenth Circuit consider three factors: (i) the "degree of success obtained," (ii) "the extent to which the plaintiffs succeeded on their theory of liability," and (iii) the "public purpose served by the plaintiffs' success." *Zinna*, 680 F.3d at 1239–40.

A plaintiff may be a prevailing party as to some claims but not others. When "counsel's work on one claim [is] unrelated to his work on another claim," the "work on an unsuccessful claim" is not compensated. *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (citations omitted). However:

> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Id.* (citations and footnote omitted); *accord Fox v. Vice*, 563 U.S. 826, 834 (2011).

Under *Hensley*, a court errs if it reduces a fee award to reflect the percentage of claims on which the plaintiff prevailing, treating each claim equally. *See, e.g., Jane L. v. Bangerter*, 61 F.3d 1505, 1511 (10th Cir. 1995) (reversing a 75% reduction in a case where the plaintiff prevailed on

two out of eight claims); *see also Durant v. Indep. Sch. Dist. No. 16*, 990 F.2d 560, 566 (10th Cir. 1993) ("Because Ms. Durant's claims arose out of a common core of facts and involved related legal theories, the district court may . . . conclude her prevailing party status on the First Amendment claim subsumes her failure to succeed ultimately on the due process claim."); *Gurule v. Wilson*, 635 F.2d 782, 793–94 (10th Cir. 1980) ("A technical dissection of the course of litigation and a mechanical proportionate reduction of the total fee is not in keeping with either the express intent of Congress or the broad remedial purposes of the Civil Rights Acts. Where the 'issue was all part and parcel of one matter-counsel should not be penalized for every lost motion.'") (citation omitted). Instead, the court should focus on "the time necessarily devoted to the litigation as a whole and the general overall success of plaintiffs." *Jane L*, 61 F.3d at 1511.

"An award that does not fully compensate an attorney for his time plainly does not meet the standard of reasonable fees." *Gurule*, 635 F.2d at 793. Under the Supreme Court's "lodestar" principle, the proper starting point for assessing the amount of attorney's fees to be awarded is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. Work eligible for fee awards includes (1) reasonable pre-litigation efforts such as "attorney-client interviews, investigation of the facts of the case, research on the viability of potential legal claims, drafting of the complaint and accompanying documents, and preparation for dealing with expected preliminary motions and discovery requests," *Webb v. Bd. of Educ. of Dyer Cty.*, 471 U.S. 234, 250 (1985) (Brennan, J., concurring); *Veasey v. Abbott*, No. 13-193, Docket No. 1211, at 48 (S.D. Tex. May 27, 2020); (2) district court merits proceedings; (3) appellate proceedings, *see, e.g., Bond v. Stanton*, 630 F.2d 1231, 1234–35 (7th Cir. 1980); and (4) reasonable efforts to prepare and, as necessary, litigate, the fee and expenses request itself, *see, e.g., Case v. Unified Sch. Dist. No. 223*, 157 F.3d 1243, 1254–55 (10th Cir. 1998) (reversing an

order denying such compensation); *Hernandez v. George*, 793 F.2d 264, 269 (10th Cir. 1986) ("[T]his court generally allows recovery of fees for attorneys' work in seeking attorneys' fees."); *Bond*, 630 F.2d at 1235; *Veasey* at 42-44.

The prevailing party must exercise "billing judgment," *i.e.,* make a "good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary," *Hensley*, 461 U.S. at 434, and must prove "the extent and reasonableness of requested attorney's fees with meticulous and contemporaneous time records." *Sheets v. Salt Lake Cty.,* 45 F.3d 1383, 1391 (10th Cir. 1995). Conversely, arguments by the losing party that the fees claimed are "duplicative and exorbitant in nature" should not be entertained if those arguments are unsubstantiated. *Id.; accord Blum v. Stenson,* 465 U.S. 886, 892 n.5 (1984).

"[T]he lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue,* 559 U.S. at 551. "'[T]he burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.' 'The quality of the lawyer's performance in the case should also be considered.'" *Jensen v. W. Jordan City*, 968 F.3d 1187, 1200 (10th Cir. 2020) (citations omitted). There is a "strong presumption" that fees based on the lodestar principle are reasonable, but "superior attorney performance can justify an enhancement" in "rare and exceptional" circumstances. *Perdue*, 559 U.S. at 554.

The determination of appropriate hourly rates is guided by the principle that the fees awarded "must be in line with those fees traditionally received from a fee-paying client." *Gurule,* 635 F.2d at 793. Thus, market rates apply — not artificially low rates such as those set under the

Criminal Justice Act, 18 U.S.C. § 3006A.  *Id.*  The party seeking fees "must provide evidence of the prevailing market rate for similar services by 'lawyers of reasonably comparable skill, experience, and reputation' in the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224-25 (10th Cir. 2006) (quoting *Blum*, 465 U.S. at 895 n.11).  "'The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation.'"  *Id.* at 1225 (citations omitted); *see also Ramos v. Lamm,* 713 F.2d 546, 555 (10th Cir. 1983) ("The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time.").  In some circumstances, it may be reasonable to apply different rates to different kinds of work performed by the same attorney.  *See id.* at 555 n.5.  An attorney's customary rate is relevant but not conclusive.  *Id.* at 555*; Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998).

Finally, where there is "exceptional delay in payment of fees," compensation for that delay is appropriate "'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.'" *Perdue*, 559 U.S. at 556 (quoting *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989)).  The Tenth Circuit has approved the practice of compensating for the time value of money by basing the entire fees award on rates that are current as of the date of the award:

> The hourly rate at which compensation is awarded should reflect rates in effect at the time the fee is being established by the court, rather than those in effect at the time the services were performed. The lawyers seeking fees usually will not have been paid for their services until the court makes its allowance. We think that awarding compensation at current rates will roughly approximate periodic compensation adjusted for inflation and interest and will obviate the necessity of guessing when periodic billings would have been made and paid in an analogous private practice situation. Generally, no prejudgment interest should be paid for the period before the fees are awarded.

*Ramos*, 713 F.2d at 555.[3]

## ARGUMENT

**I.    Plaintiff Bednasek Is Entitled to a Reasonable Attorney's Fee, Reasonable Expert Fees, and Other Reasonable Litigation Expenses as a Prevailing Party**

42 U.S.C. § 1988 and 53 U.S.C. § 10310(e) generally entitle prevailing plaintiffs in civil rights and voting rights cases, respectively, to an award of reasonable attorney's fees, reasonable expert fees and other reasonable litigation expenses. This case fits within both provisions: it is a civil rights action under 42 U.S.C. § 1983 to enforce the voting rights guarantee of the Fourteenth Amendment. *See* Docket No. 88 (Third Am. Compl.) ¶ 1. And Plaintiff prevailed comprehensively, at all court levels, on his § 1983/Fourteenth Amendment claim. *See Fish,* 309 F. Supp. 3d at 1106-14, 1119, *aff'd,* 957 F.3d 1105, *cert. denied,* 2020 WL 7327906. Plaintiff obtained "actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff," *Lefemine,* 568 U.S. at 4 — indeed, Plaintiff obtained everything he sought: the complete invalidation of K.S.A. § 25-2309(l). That Plaintiff did not prevail on every legal claim in his complaint is of no significance; what matters for prevailing party status is "the significance of the overall relief obtained by the plaintiff." *Hensley,* 461 U.S. at 435. Having obtained such "excellent results," plaintiff and his counsel "should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Id.*

---

[3] The U.S. District Court for the Southern District of Texas took the same approach in the recent *Veasey* case: "using current rates is appropriate as compensation for the time value of money, given the long delay between the time work was done and this Order." *Veasey* at 21.

**II.    A Lodestar Attorneys' Fees Award of $703,268.75 for Dentons US LLP and $91,047.50 for Fagan Emert Is Appropriate**

There is a "strong presumption" in favor of fees based on the "lodestar principle," *Perdue*, 559 U.S. at 554 — *i.e.,* attorney hours worked and recorded on the case (after exercise of billing judgment to exclude hours nor reasonable included) multiplied by "the prevailing market rate for similar services by 'lawyers of reasonably comparable skill, experience, and reputation' in the relevant community." *Lippoldt*, 468 F.3d at 1224-25 (citation omitted).   Under the principle authorized by the Supreme Court in *Perdue*, 559 U.S. at 556, and adopted by the Tenth Circuit in *Ramos,* 713 F.2d at 555, the appropriate hourly rates are those prevailing at the time of the fee award (not at an earlier date when the work was done).   As detailed below, the rates and hours claimed in Plaintiff's motion are reasonable and consistent with the lodestar principle.

A.    <u>Hourly Rates</u>

*1.    Background, Qualifications, and Experience of Plaintiff's Attorneys*

The two Dentons lawyers who were principally responsible for representing Plaintiff through the appeal to the Tenth Circuit, Mark Johnson and Curtis Woods, have provided declarations in that describe their qualifications and experience.   Simon Steel, also a member of the Dentons firm, joined the Plaintiff's team in 2020, when the State sought a writ of certiorari at the Supreme Court, also has provided a declaration concerning his qualifications and experience. *See* Exhibits A (Johnson), B (Woods), and C (Steel) included herewith.   Mark Emert, a partner with the Fagan Emert law firm of Lawrence, Kansas, has also provided a declaration in support of the Motion, which also describes the work performed and qualifications of William Lawrence, Paul Davis, and Mr. Emert, as well as appropriate rates for each of those lawyers.   For example, Mr. Lawrence performed substantial work on the case until he left the firm to become Chief of

Staff to Senator Anthony Hensley; Mr. Lawrence is now Chief of Staff to Governor Laura Kelly. *See* Exhibit F.

As their declarations demonstrate, Mr. Johnson and Mr. Woods have practiced law in Kansas City for over forty years. They have been partners in two prominent Kansas City law firms, and have tried many civil and criminal matters in state and federal courts in Kansas City and other cities. Mr. Johnson has been active in performing election-related work for over a decade, including being lead counsel in several election cases in state and federal fora. He has taught election law and campaign finance at the University of Kansas Law School for a decade as well, while maintaining a full-time practice at the Dentons Law Firm. In his career spanning 45 years, Mr. Woods has focused his litigation practice on commercial litigation, white collar criminal defense, and appellate litigation. He has handled litigation and tried cases in this Court before several judges, including Earl O'Connor, Dale Saffels, Wesley Brown, John Lungstrum, Richard Rogers, Kathryn Vratil, Thomas Van Bebber, and Carlos Murguia. He has been recognized in Chambers USA Guide to Leading Lawyers and Best Lawyers In America annually over the last 17 years. He has briefed and argued appeals in six United States Circuit Courts of Appeal, including the Tenth Circuit. He has written and lectured regarding federal trial and motion practice and federal civil procedure.

Mr. Steel is an attorney of 25 years' experience who joined the Dentons team working on the case because of his Supreme Court expertise. He clerked for Justice Sandra Day O'Connor during the 1995 term of the Court, having previously clerked for Judge Stephen G. Breyer on the U.S. Court of Appeals for the First Circuit. Since he entered private practice Mr. Steel has represented many clients in matters before the Supreme Court and other federal appellate courts. For example, in the past year, Mr. Steel has represented the Government of Canada and Milliman,

Inc. before the Supreme Court, represented Tri-State Generation and Transmission Association, Inc. in the D.C. Circuit, and filed amicus briefs in two Tenth Circuit cases. As the Dentons time records attached to Mr. Johnson's declaration demonstrate, Mr. Steel worked on the successful opposition to the State's petition for a writ of certiorari, and subsequently on this fee application. In each of the Supreme Court matters Mr. Steel worked on for paying clients in 2020, Dentons charged and received $710 per hour for his work; in 2021, his rate is $745.

2. *Prevailing Market Rates for Comparable Attorneys*

The appropriate hourly rate for each attorney is that for "similar services by 'lawyers of reasonably comparable skill, experience, and reputation' in the relevant community." *Lippoldt*, 468 F.3d at 1224-25 (citation omitted). That rate properly reflects the attorney's credentials, the type of work performed, the difficulty of the work, and the forum in which it is performed. In this case, most of the work was performed by attorneys of over 25 years' experience with expertise in complex voting rights and appellate litigation; it was constitutional voting rights litigation of state-wide and, indeed, nationwide significance; it was exceptionally difficult, given the novelty of the constitutional issue, the complexity of the fact and expert evidence, and the vigor of Defendant's opposition; and it was performed before this Court, the Tenth Circuit, and the U.S. Supreme Court.

Defining "the relevant community" is important given local variations in rates. While some orders in civil rights cases have defined "the relevant community" narrowly as the city in which the trial occurs, "the Tenth Circuit has not held that the relevant community is limited to a specific metropolitan area where the case is designated for trial." *In re Twiford Enters., Inc.,* No. BAP WY-19-037, 2020 WL 6075691, at *9 (B.A.P. 10th Cir. Oct. 15, 2020) (citation omitted). Recent decisions in this District have defined the relevant legal community as the entire District of Kansas plus the neighboring market of Kansas City, Missouri. *See Lawson v. Spirit AeroSys.,*

*Inc.,* 2020 WL 6343292, \*16-\*17 (D. Kan. Oct. 29, 2020); *Fox v. Pittsburg State Univ.,* 258 F. Supp. 3d 1243, 1264 (D. Kan. 2017); *see also Ad Astra Recovery Servs., Inc. v. Heath,* 2020 WL 4346965, \*8 (D. Kan. July 29, 2020) (using "the District of Kansas" as the relevant legal community).[4]  That broad legal community definition is particularly appropriate in this case, which involves a state-wide constitutional remedy of nationwide significance for voting rights, not a local civil rights dispute. *See, e.g., Lippoldt,* 468 F.3d at 1225 (broad legal community definition, and rates higher than local rates, may be appropriate where a case is "unusual or requires such special skills that only an out-of-state attorney possesses"). Of course, for the Tenth Circuit and Supreme Court stages of this litigation, the relevant legal community is that of experienced appellate advocates before those courts. And the higher rates that prevail before those appellate courts are also relevant to the work performed in this Court in this case, since this case involves the kind of specialist voting rights constitutional issues that are inevitably resolved at an appellate level.

Plaintiff has provided with the Memorandum declarations from Patrick Stueve and J. Nick Badgerow (Exhibits D and E), both of whom are highly respected state and federal practitioners in the Kansas City area and partners in prominent law firms. *See* Exhibits E and F. The declarations affirm that the Kansas City metropolitan area is the appropriate community for determination of an appropriate rate for work before this Court, and they support the hourly rates which Plaintiff seeks for work performed in this case.

        3.      *Hourly Rates Requested*

---

[4] Several other district courts have taken a whole-federal-district approach to determining the relevant legal community in which prevailing rates should be ascertained. *See, e.g., Veasey* at 18; *Bear Ranch, LLC v. Heartland Beef, Inc.,* 2016 WL 3549483, \*5 (S.D. Tex. 2016); *Ramirez v. Lewis Energy Group, L.P.,* 197 F. Supp. 3d 952, 956 (S.D. Tex. 2016); *Comar Marine Corp. v. Raider Marine Logistics, LLC,* 2016 WL 99208, \*4 (W.D. La. Jan. 7, 2016); *Schlieper v. City of Wichita Falls,* 2003 WL 21355982, \*3 (N.D. Tex. June 6, 2003).

Plaintiff is seeking hourly rates that are reasonable, given the skill and experience of the attorneys involved in this complex and precedent-setting litigation. For Dentons partners who worked on the case, Plaintiff seeks an hourly rate of $500. Depending on their level of experience, Plaintiff seeks hourly rate of $250 for two Dentons associates who worked on the case (their qualifications are addressed in Mr. Johnson's declaration). In no way may those rates be viewed as excessive.

Plaintiff acknowledges that two years ago the Court awarded Plaintiffs in *Fish* a partner hourly rate of $450 for work performed on a motion for contempt. However, the additional $50 per hour Plaintiff seeks is more than justified by several facts:

(a) Plaintiff is seeking payment for over five years of work, not just a couple months, as was the case with the contempt fees;

(b) the work involved was much more complex (specialist election law work, written discovery, depositions, trial preparation, several days of trial, and more than two years of appellate work);

(c) the result obtained was victory in the entire case, not a motion; and

(d) consistent with the Tenth Circuit's guidance in *Ramos*, 713 F.2d at 555, the appropriate rates are those that prevail at the time of the fee award, which are higher now than two years ago.

The declarations of Mr. Stueve and Mr. Badgerow also support the hourly rates Plaintiff seeks. Both declarations demonstrate that partner-level work of type performed by Messrs. Johnson, Woods, and Steel justify a $500 rate.

Similarly, the rates Plaintiff seeks for associate work are reasonable. Samantha Wenger and Jennifer Walroth of the Dentons firm and Will Lawrence of Fagan Emert were mid to senior-level associates at the time they worked on the case. Mr. Lawrence's work was crucial in the early phases of the case, as he drafted the initial complaint, filed the case, and handled all of the procedural aspects of the case for the first month of its pendency. He continued to be deeply

involved after that time, until he left Fagan Emert to enter government service. Ms. Wenger and Ms. Walroth worked on research and briefing, largely during the summary disposition phase of the case. As the declarations demonstrate, as well as the Court's earlier order on attorneys' fees, the $250 per hour rate Plaintiff seeks for those attorneys is reasonable.

        B.      Hours Billed and Billing Discretion

As Mr. Johnson's declaration (Exhibit A) explains, Mr. Johnson has carefully reviewed all the hours recorded, and the attorneys and paralegals for whose work fees are sought recorded the time they devoted to this case contemporaneously as they would for any billable matter. In preparing this fee application, Mr. Johnson exercised appropriate billing discretion by excluding from the application any attorney who billed fewer than fifty hours to the case, resulting in a reduction of 41.9 hours, and reducing the number of hours worked on the summary judgement motions by 25%, in recognition of that fact that, although Plaintiff ultimately obtained all the relief he sought, Plaintiff did not prevail on every count he asserted. On behalf of Fagan Emert, Mr. Emert made a similar fee reduction. See Exhibit F.

The remaining hours worked on this case amount to less than the equivalent of one person-year. When it is considered that these hours were worked over more than five years, with two and one-half years of pretrial motion practice, discovery (both expert and fact witnesses), preparation for the testimony of numerous witnesses at trial, the drafting of numerous trial pleadings, seven full days of trial, extensive post-trial filings, briefing and argument at the Tenth Circuit, and preparation of pleadings before the Supreme Court, the reasonableness of the hours expended becomes obvious. At no point did Plaintiff pad its team. New lawyers were never brought in to fill their time. Lawyers did not shuttle in and out of the case, so there was never any need to bring

new lawyers up to speed.  Efficiency was the watchword for the Plaintiff's trial team, and that efficiency was key to obtaining a successful result that garnered national attention.

### III.   An Upward Adjustment to Lodestar Fees Is Appropriate

"The lodestar is the presumptively reasonable fee." *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1493 (10th Cir. 1994).  However, the Court may make adjustments in light of the factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974), although, as this Court has noted, "many of those factors are subsumed within the lodestar calculation." *Kansas Judicial Watch,* 2012 WL 1033634, *12 (citing *Hensley,* 461 U.S. at 434 n.9).

Considering those factors, there is no basis for any downward adjustment to the lodestar fee in this case.  This is not a case of partial success: Plaintiff secured, in full, all the relief he sought.  This is not a case of excessive time and labor: Plaintiff's legal team, which was relatively small for a case of this magnitude and complexity, worked efficiently to overcome the many obstacles before it.  And this was certainly not an easy case: significant election law and appellate litigation expertise, experience and skill were required to prevail on this first-of-its-kind constitutional challenge to a DPOC law.  This case attracted national attention because of its importance to the cause of voting rights.

To the contrary, insofar as the *Johnson* factors are not "subsumed within the lodestar calculation," this is the kind of "rare and exceptional" case in which "superior attorney performance" merits an "enhanced award" in excess of the traditional "lodestar calculation." *Perdue,* 559 U.S. at 554-56.  Several of the *Johnson* factors — particularly "[t]he novelty and

difficulty of the questions," "the skill requisite to perform the legal service properly," "the results obtained," and "[t]he experience, reputation and ability of the attorneys," 488 F.2d at 717-18 — point towards an upward adjustment.

*Perdue* suggests that it is preferable to factor excellent lawyering into the lodestar calculation rather than use it to adjust the lodestar calculation, but permits an enhancement to reflect the market value of the individual attorney when treating the attorney as a generic practitioner of a certain level of experience would fail to reflect "the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes." *Perdue*, 559 U.S. at 555. On that basis, an enhancement to bridge the gap between generic prevailing rates and the rates actually charged by the lead attorneys in this case to paying clients would be appropriate. In addition, *Perdue* permits an enhancement for "exceptional delay in the payment of fees." *Id.* at 556. In this case, Plaintiffs' counsel have been working, often intensely, for more than five years without receiving any payment. At a minimum, consistent with *Perdue* and the Tenth Circuit's decision in *Ramos*, 713 F.2d at 555, that merits the application of current hourly rates to all work performed.

## CONCLUSION

Plaintiff's counsel respectfully requests an award of at least $703,268.75 in attorney's fees and $21,139.55 in expenses to Dentons US LLP and $91,047.50 in fees and $888.35 in expenses to Fagan Emert. The amounts sought are detailed in attachments to Exhibits A and F, the declarations of Mr. Johnson and Mr. Emert.

Dated this 28th day of January, 2021.

Respectfully Submitted,

**DENTONS US LLP**

/S/ Mark P. Johnson_____
Mark P. Johnson Ks Bar #22289
Curtis E. Woods Mo. Bar # 27065 (*pro hac vice*)
Samantha J. Wenger KS Bar #25322
Dentons US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
816/460-2400
816/531-7545 (fax)
mark.johnson@dentons.com
curtis.woods@dentons.com
samantha.wenger@dentons.com


Mark Emert Ks Bar  #22186
**FAGAN EMERT L.L.C.**
730 New Hampshire Street, Suite 210
Lawrence, KS 66044
(785) 331-0300 – Telephone
(785) 331-0303 – Facsimile
memert@fed-firm.com

Attorneys for Plaintiff Parker Bednasek

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of January, 2021, I electronically filed the above and foregoing document using the CM/ECF system, which automatically causes notice and a copy of this filing to be sent to all counsel of record.

/s/Mark P. Johnson
Mark P. Johnson
Attorney for Plaintiff